Hon. HOMER E. ROYCE,  
Hon. JONATHAN ROSS,  }Assistant Judges.  
Hon. WHEELOCK G. VEAZEY,

---

### TOWN OF BALTIMORE *v.* TOWN OF CHESTER.

*Pauper. Imprisonment in the · State Prison does not Interrupt the Residence.*

1. Imprisonment in the State prison for a limited term of two years does not *interrupt the legal residence* of the prisoner, *under the pauper law,* when he has a family and home in a town, resides there at the time he is imprisoned, and the evidence shows a purpose on his part to continue such residence, and to return to it as soon as he is liberated.
2. *Civiliter mortuus,*—applicable to what persons at common law. ' In this State there is lacking one of the essential elements of *civil death—taint from crime.*

THIS was an order of removal of Joseph P. Glynn and Nancy Glynn, his wife, from the town of Baltimore to the town of Chester. Trial by the court, May Term, 1880, BARRETT, J., presiding. Plea, that the last legal settlement of the pauper was not in the town of Chester. The court decided that the pauper had not

gained a settlement in Baltimore. The facts, relating to the question decided by the Supreme Court, are sufficiently stated in the opinion.

*Walker & Goddard*, for the plaintiff.

Did the pauper acquire a legal settlement in Baltimore by his family having resided there seven years? We say not, for the reason that for nearly two years he was confined in the State prison. By the common law of England a conviction for crime and a transportation made the convict *civiliter mortuus*, and he forfeited his rights as a citizen. *Regina* v. *Hatfield*, 9 Law & Eq. 309. The same doctrine prevails in Connecticut. *Reading* v. *Westport*, 19 Conn. 561 ; 5 Day, 196. The Supreme Court of this State, although not deciding this particular question, clearly intimated that such is the law. *Northfield* v. *Vershire*, 33 Vt. 110.

The time that the pauper was confined in the State prison should not be counted in making up the seven years' residence: 1st, Because while confined in State prison the pauper's residence in the town of Baltimore was interrupted. It was wholly beyond his power to return to Baltimore. 2d, Because he was in the eyes of the law dead, and had no legal existence. 3d, Because the town of Baltimore during his confinement in prison could not touch or reach the pauper with the aid of the law to remove him and his family.

*Wm. E. Johnson* and *L. Adams*, for the defendant.

The question here is: Can the time when the pauper was in prison count to make up the seven years?

It was early settled in this State that a pauper imprisoned in jail was to be regarded as a transient person, and not one who had come to reside ; consequently, such imprisonment did not interrupt a continuous residence. *Pawlet* v. *Rutland*, Brayton, 175; *Manchester* v. *Rupert*, 6 Vt. 291 ; *Danville* v. *Putney*, 6 Vt. 518 ; *Cushing* v. *Hale*, 8 Vt. 46 ; *Bristol* v. *Rutland*, 10 Vt. 577 ; *Woodstock* v. *Hartland*, 21 Vt. 563 ; *Brownington* v. *Charleston*, 32 Vt. 414 ; *Newark* v. *Sutton*, 40 Vt. 264 ; *Peacham* v. *Waterford*, 46 Vt. 54 ; *Northfield* v. *Vershire*, 33 Vt. 110.

The last case seems to be decisive of this question. The pauper was not sentenced for a felony.

The opinion of the court was delivered by

VEAZEY, J.   One question in this case is, whether the imprisonment of the pauper in question in the State prison interrupted his residence in Baltimore so as to affect his acquiring a settlement there.   The case finds that he resided in Baltimore with his family from September, 1871, to May, 1877; and at the May Term of Windsor County Court, 1877, he was sentenced to the State prison for a term of two years for poisoning swine ; and was confined in said prison for the term of his sentence, except two months which was deducted for good behavior.   If this imprisonment did not interrupt his residence in Baltimore, then it was sufficient in time to gain a settlement there under the statute.

He was about eighty years old, and during his imprisonment his wife and son often visited him ; and they continued their former residence in Baltimore the same as previous to the imprisonment ; and after it terminated he returned to his wife and home in Baltimore, and resided there with her and his son until these proceedings were commenced.

In *Northfield* v. *Vershire*, 33 Vt. 110, it was held that imprisonment in jail on a charge of larceny did not interrupt a residence so as to prevent gaining a settlement.   The reasons for that decision are fully stated by Judge POLAND in that case, and may as well be referred to, as to be restated here.

Is there any sufficient ground for distinction between imprisonment in jail, on a charge of crime, and in the State prison on conviction of an offence, not a felony, and sentence for the term of two years, that should be held to affect the question of settlement ?

We cannot adopt the view suggested in argument, that imprisonment in the State prison is voluntary because the prisoner voluntarily commits the crime upon which he is convicted.   Absence from home on account of imprisonment in the State prison on conviction is certainly quite as compulsory in every sense, as on account of imprisonment in jail on a charge of crime.

But, it is urged, that the prisoner in the State prison on conviction

is civilly dead, and all his civil rights are forfeited ; and that he is not regarded as having any civil existence during the term of the sentence.    This was not the effect of imprisonment under sentence for crime in all cases at common law.

A *dictum* of Lord COKE, (Co. Litt. 130 a.) that : " besides men attainted in a *præmunire*, every person that is attainted of high treason, petit treason, or felony, is disabled to bring any action, for he is *extra legem positus*, and is accounted in law *civiliter mortuus*," led Chancellor Kent to think, as he intimated in *Troup* v. *Wood*, 4 Johns. Ch. Rep. 228, that every person attainted of felony was accounted in law *civiliter mortuus ;* but in a later case, *Planter* v. *Sherwood*, 6 Ib. 118, he said this *dictum* of Lord COKE " is not to be taken in the full latitude of expression," and after reference to other expressions of Lord COKE (Co. Litt. 132, a. b. 133, a.; 3 Inst. 215) he says :    " The strict civil death seems to have been confined to the cases of persons professed, or abjured, or banished' the realm, and I do not find that it was ever carried further by the common law."    This view is well sustained by authority.    See *Bannister* v. *Trussel*, Cro. Eliz. 516 ; *Ramsay* v. *Macdonald*, 1 Wils. 217 ; Foster's Crown Law, 61, 62, 63 ; *Coppin* v. *Gunner*, 2 Lord RAYM., 1572.

The term, civil death, as used in the books, seemed to involve, *first*, a total extinction of the civil rights and relations of the party, so that he could neither take nor hold property, but his estate passed to his heirs as though he were really dead, or was forfeited to the crown ; and of this kind were the cases of monks professed, and abjuration of the realm.    But profession was a creature of the ecclesiastical law, and the relinquishment of the estate was voluntary.    1 Domat. 25, art. 13.    This species of civil death terminated when popery was abolished in England, and the monasteries taken into the hands of the king.    Abjuration of the realm was abolished by the Statute of James I, ch. 28. *Second*, an incapacity to hold property, or to sue in the king's courts, attended with forfeiture of the estate and corruption of blood ; and the king took the property to the exclusion of the heirs.    *Jackson* v. *Catlin*, 2 Johns. Rep. 262 ; 1 Domat. 531, s. 14.

There were cases in the English law, where the party was sen

tenced to perpetual imprisonment or perpetual banishment for an offence not attended with forfeiture of his estate.    2 Inst. 199. Stat. Westm. I. ch. 20 ; 2 Inst. 201, n. 10.    Stat. Westm. II. ch. 35 ; 2 Inst. 437, 439.    And it would seem that perpetual imprisonment or perpetual banishment, *without forfeiture of the estate*, did not in England produce civil death.    Str. 872 ; Lord RAYM., 1572.

As crimes do not work a forfeiture of the estate or corruption of blood in this State, there is lacking that taint from crime which seems to have constituted at the common law one of the essential elements of civil death.

We have no statute defining generally what constitutes felony. Certain statutes declare that certain specified crimes shall be deemed felonies that were not felonies at the common law.    The poisoning of swine was not a felony at common law, and is not declared a felony by our statute.

In *State* v. *Cooper*, 16 Vt. 551, which was an indictment for burglary under our statute making it burglary for any one in the night time to break and enter any dwelling-house, &c., with intent to commit the crime of " murder, rape, robbery, larceny, *or any other felony*," where the conviction was upon proof that the breaking and entering was with intent to commit adultery, judgment was arrested, and on the ground that at common law adultery was not a felony, and was not declared such by our statute.

We have statutes providing what shall be the effect of imprisonment for crime in certain respects.    A life sentence operates as the natural death of a person, so far as it in any way relates to his marriage or the settlement of his estate.    Gen. Sts. ch. 120, s. 19.    A sentence for three years or more is a cause for divorce, ch. 70, s. 18.    For certain purposes the wife is deemed a *feme sole* while the husband is in State prison ; ch. 71, s. 13.    These seem to be all based on the principle that a prisoner's legal rights, subject to his personal restraint, are unaffected by the imprisonment, except as specially provided by statute.    In England it is expressly provided in the settlement act, 9 and 10, Vic. c. 66, s. 1, that " the time during which such person shall be a prisoner in a prison, &c., shall be for all purposes excluded from the compu-

tation of time," &c., which by that act is five years. I have not found any English case where this was held as simply declaratory of the common law.

The plaintiff cites and relies on the case of *Reading* v. *Westport*, 19 Conn. 561, where it was held that the period of a person's imprisonment for crime does not constitute any portion of the successive residence requisite to his acquisition of a legal settlement by commorancy. That case differs from this, in that the prisoner left no family in the town to represent him, or continue his home. There were no facts upon which the court could properly base a finding that the pauper intended to continue his residence in the same town or return to it at the end of his term.

Here we have the fact of a home and family continuing as before the imprisonment; and as we hold a continuing purpose to return to it at the earliest moment practicable; and a return to it in fact. Absences for purposes of business or pleasure, or by reason of sickness which might be as compulsory as imprisonment, so far as the power of the individual to return is concerned, do not interrupt a residence so as to prevent gaining a settlement.

It does not appear how the Connecticut Court regarded imprisonment in jail on a charge of crime, on this question. The reasoning of the learned judge in that case would apply as well to an imprisonment in jail as in State prison; and those reasons were pressed upon the court in *Northfield* v. *Vershire, supra*. We do not criticise the determination of the Connecticut case upon the facts in it; but the reasons suggested in the opinion of the court for the decision, which are now urged upon us, are not sufficient, in our judgment to control this case upon its facts.

Where a pauper has a family and home in a town, and resides there at the time he is imprisoned, and the evidence is sufficient to show a purpose to continue such residence, and to return to it as soon as liberated, we think that his compulsory absence by reason of imprisonment for a limited term for such a crime as this was, though in the State prison, does not interrupt his legal residence in that town.

The plaintiff's counsel argue that it should be held otherwise because there is no way provided by statute for removal of a pau-

per while in prison. This argument would be appropriately addressed to the legislature, and is sometimes a proper subject of consideration by a court; but it is not sufficient in this case.

The decision made of the question above discussed renders it unnecessary to pass on the other question presented by the exceptions.

Judgment reversed, and judgment that the pauper was unduly removed.