# NEUBERGER v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. July 13, 1926.)

No. 101.

**1. Aliens ⬅⬆62—Enforced stay in native country by applicant for citizenship held not to prevent five years' continuous residence next previous to application.**

That German subject, applying for citizenship in April, 1924, while visiting his native land in 1914, was compelled to serve in German army as noncombatant till 1918, and was thereafter prevented by existing conditions from returning to the United States until May, 1921, *held* not to prevent five years' continuous residence next previous to application.

**2. Aliens ⬅⬆62.**

Not every absence is fatal to continuous residence, as affects right to citizenship.

**3. Domicile ⬅⬆2.**

Residence involves choice, and mere presence elsewhere through restraint has no effect on it.

Hough, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

In the matter of the application of Moritz Neuberger for citizenship. From a decree denying application (6 F.[2d] 387), applicant appeals. Decree reversed, and cause remanded.

See, also, 9 F.(2d) 1020.

Appeal from an order denying the appellant's application for citizenship because of his failure to prove continuous residence for the previous five years.

The applicant was born a German subject in Bavaria in 1873, and came to New York in 1903, where he lived until June, 1914, when he left under circumstances to be described. He married an American in March, 1903, had two children born here, and was continuously engaged in business from that time forward, either as an employee or as an officer of a corporation in which he was interested. In the spring of 1914 he bought a return ticket for himself and his family to and from the port of Antwerp by the Red Star Line, to leave on the 23d of June, and to return at the beginning of September. His apartment was still under lease for two years, his motorcar remained unsold, and he kept his chauffeur under wages. While summering at The Hague, his brother died in Germany, and on July 15th he and his family went to Königstein, in Germany, to help his sister-in-law and her family. Thence he went to Nuremberg

to see a sister, where he was at the outbreak of the Great War.

He had served in the German Army before 1903, but had procured his discharge in 1913, 10 years after coming to the United States. Because he was still a German subject, he was ordered by the German authorities to serve in the army as a noncombatant in the post office, where he remained till December 28, 1918, when he was discharged. The circumstances of this service it is not necessary to set out, except to say that from his affidavits, which were the only evidence, he was compelled to serve, without alternative but to expose himself to such penalties as German military law might exact. He finally sailed from Rotterdam on May 17, 1921, reaching New York on May 27, 1921. His petition for admission was filed on April 28, 1924.

He explained the delay between December 28, 1918, and May 17, 1921, by saying that he was without means, that in spite of repeated efforts he was unable to get any passport or permission to return, and that the general conditions of Europe made it impossible for a German to enter any other country, except on official business. Towards the end of 1920 his brother-in-law in this country got permission for him to return, which was formally granted on April 2, 1921, and was delivered to him on April 15th. An illness of one of his children delayed him another month. On his arrival he at once took up his business and began living again in his old apartment.

Louis Marshall, Eugene Untermyer, and Herbert S. Brussel, all of New York City, for appellant.

Emory R. Buckner, U. S. Atty., of New York City (Charles Lincoln Sylvester, of New York City, of counsel), for the United States.

Before HOUGH, HAND, and MACK, Circuit Judges.

HAND, Circuit Judge (after stating the facts as above). [1, 2] That Neuberger's domicile remained in New York there is not the slightest question. On the record, his detention until December, 1918, was involuntary, and while the explanation of his subsequent delay of over two years before returning might prove inadequate upon cross-examination, or upon a trial under a bill to cancel, we shall accept it for the purposes of this appeal. Indeed, even if he voluntarily lingered for a part of that time, it would not have lost him his domicile. New York was his adopted home, and he clearly never meant to abandon it. But residence is another thing from domicile, though just what it is, is not altogether plain. In U. S. v. Mulvey, 232 F. 513, 146 C. C. A. 471, we held that an alien, who, having established a residence here, had voluntarily absented himself for over two years out of the five, had lost his residence, though his domicile remained. We have no question of the correctness of that decision, or of the language in it which involves the conclusion that a man may have continuous residence if he is away for one year; but not if he is away for two. In so far, however, as it may be thought to hold that there is a period of absence which of itself and without more will break the continuity of the alien's residence, it is misapprehended. Absence or absences may be, and, when voluntarily, generally are, a controlling test, but only as evidence of the alien's state of mind towards the place of supposed residence. Of themselves they are immaterial, once the residence is established; in this, residence is like domicile. Were it not so, the rule must have been that any absence is fatal to continuous residence, which is contrary to all the books. In re An Alien, Fed. Cas. No. 201a; In re Schneider (C. C.) 164 F. 335; U. S. v. Rockteschell, 208 F. 530, 125 C. C. A. 532 (C. C. A. 9); In re Deans (D. C.) 208 F. 1018; Id., 230 F. 957, 145 C. C. A. 151 (C. C. A. 8); In re Timourian (D. C.) 225 F. 570; U. S. v. Jorgenson, 241 F. 412; In re Reichenburg, 238 F. 859; U. S. v. Cantini, 212 F. 925, 129 C. C. A. 445 (C. C. A. 3); In re Mulvey, 232 F. 513, 146 C. C. A. 471 (C. C. A. 2).

[3] We shall not try to define what is the necessary attitude of mind to create or retain a residence under this statute, and how it differs from the choice of a "home," which is the test of domicile. Frankly it is doubtful whether courts have as yet come to any agreement on the question. But there is substantial unanimity that, however construed in a statute, residence involves some choice, again like domicile, and that presence elsewhere through constraint has no effect upon it. Stadtmuller v. Miller, 11 F.(2d) 732 (C. C. A. 2); U. S. v. Gronich (D. C.) 211 F. 548; American Surety Co. v. Cosgrove, 40 Misc. Rep. 262, 81 N. Y. S. 945; Grant v. Dalliber, 11 Conn. 234; Millett v. Pearson, 143 Minn. 187, 173 N. W. 411, 5 A. L. R. 256; Lindsey v. Holly, 105 Miss. 740, 63 So. 222; Huffman v. Smyth, 47 Or. 573, 84 P. 80, 114 Am. St. Rep. 938, 8 Ann. Cas. 678; Northfield v. Vershire, 33 Vt. 110; Baltimore v. Chester, 53 Vt. 315, 38 Am. Rep. 677. The rule in Connecticut

is otherwise in pauper settlement cases (Reading v. Westport, 19 Conn. 561; Washington v. Kent, 38 Conn. 249), though it is not quite clear how these decisions accord with Grant v. Dalliber, 11 Conn. 234. Perhaps the form of the Maine statute, which makes "home" the test, prevents Topsham v. Lewiston, 74 Me. 236, 43 Am. Rep. 584, and Pittsfield v. Detroit, 53 Me. 442, from being in point, though nothing in the opinion suggests such a difference. People v. Cady, 143 N. Y. 100, 37 N. E. 673, 25 L. R. A. 399, turned on a clause of the New York Constitution.

If, therefore, Neuberger's story be true, and, as we have said, we think it must on this appeal be so taken, his residence, once established, was not lost by his enforced absence in Germany. It is true that we must face the consequence that it would not have been lost, if he had been absent for the whole preceding five years. We are quite aware that the result might be altogether to prevent that direct observation of him by his witnesses which the statute contemplates, and to deprive him of those contacts through which he is supposed to become assimilable to our national group. But Congress has very deliberately chosen residence as the test, repealing in 1848 (9 Stat. 240) the act of 1813 (2 Stat. 811), which required continued presence. Anonymous, Fed. Cas. No. 465. We cannot interpret the word in any other way, without involving the inconsistency at once of making mere presence the test, and yet asserting that presence for four years is continuous presence for five.

We do not, therefore, agree with the learned District Judge in thinking that Neuberger was not continuously resident here for the preceding five years. Certainly the facts justify close scrutiny, not only as to the bona fides of his excuse, but as to his compliance with the other requirements. The best way to inquire into these is by bill in equity, and possibly the department will prefer to allow the certificate to issue and attack it by this means. Since, however, the record does not show that the applicant ever satisfied the District Judge on either score, the proper disposition of the case, unless the department chooses to proceed by suit, is to send it back to the District Court for further proceedings. We decide nothing now, except that, if Neuberger's story be found true, he was continuously resident here for the five years previous to his application, and that his affidavits do not as matter of law prove him to be otherwise disqualified.

Decree reversed, and cause remanded.

HOUGH, Circuit Judge (dissenting from result). With the law as stated by Judge HAND I entirely agree, and believe that the opinion will aid a much-needed clarification of the relative meanings of the words "domicile" and "residence."

It is also in my opinion true that Neuberger's ex parte statements, which, with those of his wife, make up the bulk of this record, do not as *matter of law* show him as disqualified for citizenship, yet I feel compelled to dissent from the result announced, because it seems to me that as *matter of fact* the applicant has failed to bear the burden of proof on a vital point not mentioned in the prevailing opinion.

In this case we certified to the Supreme Court the question of our jurisdiction in naturalization and the manner of its exercise. The answer (filed April 12, 1926) was that we are required to hear such matters as this on *appeal,* not writ of error. That means that we must examine the evidence and draw our own conclusions therefrom, as in equity.

The burden of proof is clear, for (said Brandeis, J., in this case) "the applicant for citizenship, like other suitors * * * must allege * * * the fulfillment of all conditions upon the existence of which the alleged right (of receiving naturalization) is made dependent, and he must establish these allegations by competent evidence to the satisfaction of the court."

The present statute, and in substance its predecessors for a century or more, requires the petitioner to show that during the five years "immediately preceding" his application he has "behaved as a man * * * attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same." Therefore Neuberger must allege (as he does) this statutory requirement, and prove that for five years before his application date (April 28, 1924) he did behave as required by statute.

When one has listened, as I have, to several thousand applications for citizenship, and observed the average intellectual development displayed by the petitioners, it is difficult to maintain a serious mind in respect of their asserted attachment to the principles of the Constitution, for the most prominent mental trait of the overwhelming majority of them is inability to comprehend the meaning of the somewhat stilted statutory phrase. However, as linguistic skill and learning of the books have not for a long time been thought necessary for citizens or voters, the practical interpretation

of the statute has been to ascertain what the petitioner has done and how he has acted, and infer from conduct the necessary attachment, substantially on the same principle that M. Jourdain found himself an adept in French prose.

This applicant is a man of intelligence, and, as an artillerist, of some scientific attainments; consequently his acts and behavior are of even greater significance than those of the ignorant. The rule is general that a man is judged by his opportunities and capacities, as were the servants in Scripture by the number of their talents.

Neuberger came to this country before he was 30, and even then a reserve captain. It is not true that he resigned; he was, retired, and was perfectly aware that he still remained at the call of his military superiors. The captaincy was a badge of social distinction, and his conduct in using America for business for upwards of 10 years, while maintaining German nationality, marks him as one of that class, large and well known, of Germans of commissioned rank, who before the World War preferred the nationality that gave that rank consideration of a kind unknown in a democracy, which every teaching leading to the rank he cherished led him to despise.

His war duties were not different from those of most officers over 40 and not recently identified with troops; he was ordered to a service corps. For present purposes it is well to say that he worked in the Nuremberg post office, and this may be true in the same sense that a commissariat officer may be said to work in a grocery. The military order which he obeyed was to "take charge of the parcel station of the Third Bavarian Army Corps."

After the close of hostilities he remained nearly 2½ years in Germany, a period which includes 2 years (1919–21) of the 5 during which, as he must satisfy the court, he was attached to the principles of the Constitution and well disposed to the good order and happiness of the United States.

He does not satisfy me; he has not, I think, borne the burden of proving a change of heart, for no man could be at the same time a qualified German officer and attached to such a form of words as the Constitution of this country.

I know well how cheap we have made the privilege of American citizenship, but do not believe the statute requires quite this degree of cheapness; so I dissent.