**SEELEY et al. v. COMMISSIONER OF INTERNAL REVENUE.**

**SEELEY v. COMMISSIONER OF INTERNAL REVENUE.**

Nos. 118, 119, Dockets 21738, 21739.

United States Court of Appeals
Second Circuit.
Argued Dec. 6, 1950.
Decided Jan. 2, 1951.
Rehearing Denied Feb. 1, 1951.

542

Raymond F. Garrity, Carl A. Phillipps, Washington, D. C., for petitioner.

Charles Oliphant, Theron Caudle, Dept. of Justice and Francis W. Sams, all of Washington, D. C., Ellis N. Slack, A. F. Prescott, Sp. Assts. to Atty. Gen., for respondent.

Before L. HAND, Chief Judge, SWAN and CHASE, Circuit Judges.

L. HAND, Chief Judge.

The taxpayers—in one proceeding, a husband and wife, in the other, the husband alone—petition to review assessments against them upon their income taxes for the years 1943 and 1944; we shall disregard the wife and speak as though the husband alone were concerned. The question is of his gross income in the years in question: in particular, whether there should be included in it sums which he earned for services performed outside the United States. In short, the question is whether as to these amounts he brought himself within § 116(a) of the Internal Revenue Code.[1] The facts on which the appeal turns were as follows. In 1937 Seeley, the taxpayer, was in the employ of the General Motors Overseas Operations; and on March 1 of that year he was appointed "managing director" of a Swedish corporate affiliate of that organization. With his wife and two children he went to Stockholm, where he leased and furnished an apartment, and where he lived until February, 1941,—nearly four years. The children went to school in Stockholm, Seeley joined business and social clubs and all his activities were there, for he had no home in the United States, and indeed he made only one trip back here, for a little over two months in 1939. The General Motors Overseas Operations called him back in February, 1941, because of the war, and when he arrived, his passport was taken up, and he was told to go on vacation. When he came back from his vacation at a time not stated, he was told that he could not go back because of the war, and that he would have to wait until the authorities would allow his return. From June 1, 1941, to September, 1941, he was employed in New York, and then he was made "staff assistant, Pacific Region." Meanwhile he had leased an apartment in Bronxville, New York, for his family where all lived until June 20, 1942, when he was sent to London.

His wife and children did not go with him to London, because they would not have been admitted; his wife moved to an apartment in Manhattan, his son was at college and his daughter was at a school in Massachusetts. In London his duties were "to find out just what was happennig to the divisions of General Motors Overseas Operations" and "periodically to report to the general manager in New York." There were five of these "divisions"; four were manufacturing companies, and the other was an assembly plant; Seeley was a director of two. He remained in London until June, 1944, except

1. § 116 (a) (1) and (2), Title 26, U.S.C.A.

for three trips home: the first, from September 27, 1942, to November 25; the second, from May 2, 1943 to July 9; and the third, from December 23, 1943, to February 25, 1944. The first two weeks of each was counted as vacation, the rest of the time was "devoted to business matters pertaining solely to English operations." When he came back to the United States on June 15, 1944, he was at once given a vacation until October 1, 1944; and thereafter he was assigned to an appointment in New York, where he served until August 25, 1945, when he and his wife went back to Stockholm and he took up his old duties. The Swedish corporation paid his salary until September 1, 1941, after which all his pay came from the New York corporation. He paid no income taxes either in Sweden or England. Based upon these facts he takes two alternative positions: first, he says that he "resided" in Stockholm throughout the years 1943 and 1944; second, he says that, if that is not true, he "resided" in England from June 20, 1942, until he got back on June 15, 1944; and that the five days, by which this period was short of two years, is to be counted as part of the vacation after his British job, and fill out the two years made necessary by the statute.[2]

In a jurisprudence like our own, where governmental power is for most purposes limited territorially, it often becomes necessary to measure the rights and duties of a person, physically present in a place, by the permanence of his attachment to it; and obviously there may be any number of different degrees of attachment. The most permanent is "domicil," and ranging down are "residence," "habitancy," "sojourning," "transience," and perhaps others. In any given case the word chosen from among these is to be interpreted by its context: that is, by the underlying purpose of the statute or doctrine as a whole, in which it appears; and in the case of a statute that makes particularly authoritative any regulations of the officials charged with its administration.[3] In the case of this statute Judge Chesnut, after a careful examination of the sources, has said that "the statute was originally enacted in 1926 * * * for the purpose of encouraging our foreign trade by enabling United States citizens engaged in business in a foreign country to compete with other Nationals there engaged";[4] and with this we agree. Moreover, he ruled in that case that the agent of an American company who had been employed as the "chief active officer" of its business in Spain did not cease to "reside" there because the war detained him for seven months in this country, to which he had come back to report to his principal. We should hesitate to distinguish between an absence of seven months and the sixteen months between February, 1941, and June 20, 1942, during which Seeley was in New York, before he went to London; particularly in the light of our own decision in Neuberger v. United States.[5] However, it is not necessary to decide the point, because Seeley does not argue that, if he acquired a "residence" in London and kept it till he left, he had a parallel "residence" in Stockholm over the same period. We will not say that it is never possible to have two independent "residences" at the same time; but we do say that the statute here before us certainly did not contemplate such a possibility, for that would have defeated its purpose. Since, for the reasons we shall give, we hold that Seeley did acquire a "residence" in London, it follows that he did not keep his "residence" in Stockholm at the same time.

As we have said, the statute is one in which the regulations are especially authoritative, because they serve to implement a purpose, not set forth in detail. Section 29.116-1 of Regulations 111 declares: "Whether the individual citizen of the United States is a bona fide resident of a foreign country shall be determined in general by the application of the principles of sections 29.211-2, 29.211-3, 29.211-4 and 29.211-5 relating to what constitutes residence or non-residence * * *

2. § 116 (a) (2), Title 26, U.S.C.A.

3. McGrath v. Kristensen, 340 U.S. 162, 71 S.Ct. 224.

4. White v. Hofferbert, D.C., 88 F.Supp. 457, 462.

5. 2 Cir., 13 F.2d 541.

in the United States in the case of an alien individual." Of the sections so incorporated the first—§ 29.211-2—declares that a man's intentions determine whether he is a "resident" or a "transient"; and that one who is present without any "definite intention as to his stay" is a resident; though he is not, if he has a "definite purpose which in its nature may be promptly accomplished." On the other hand, when an extended stay may be necessary to accomplish his purpose, "he becomes a resident," if "he makes his home temporarily" where he has gone. Seeley was sent over because the organization "could get no financial reports," although it knew that it was spending millions; he was "to find out what was happening and periodically report * * * as to how our operations were functioning." How long that would last nobody could tell; the war censorship had made it hard to get information, though passports were easy, Great Britain being our ally; and the "job was permanent." His three trips home were for vacation and for work incidental to the main purpose, and these "will not necessarily deprive such individual of his status as a bona fide resident of a foreign country"—§ 29.116-1.

■ Tested by these conditions, Seeley was a "resident" of Britain. He had no "definite intention as to his stay"; even though it was to last only until it became easier to get information through the censor, for no one could tell when that would be. Moreover, his purpose, assuming that it had been "definite," was not one which was sure to be "promptly accomplished"; on the contrary it was of "such a nature that an extended stay may" (might) "be necessary for its accomplishment, and to that end" he made "his home temporarily" in London. That does not mean the acquisition of a domicil, for one does not acquire a domicil by a "temporary home." "He lived in London, first at the Barclay Hotel and then at a small home at 56 South Street"; and if his wife had gone along with him there could have been no fair question that together London would

have been their "temporary home." The only reason why she did not go was "because of war travel restrictions and the housing shortage caused by the bombings." Certainly it would not further the general purpose of the statute to induce Americans to take jobs abroad, if those were granted tax exemption who could take their wives, but those were not, who could not. Such husbands were *pro tanto* in the same position as single men; and, if Seeley had been single, he would certainly have had a "temporary home" in London. He had been made "managing director" of one of the five British "divisions" and a "director" of another; and he was "staff assistant" of the "British Isles Region," some other sort of "division." A man who settles down to an indefinitely continued performance of such duties, for the time being at least, has a "home."

■■ Since Seeley became a "resident" of Great Britain from the time of his arrival, soon after June 20, 1942, until he left in 1944, he was entitled to the exemption for the whole of 1943; and he was likewise entitled to so much of his income as was paid in 1944 for his British activities, provided he had "resided" in Britain for two years, all told.[6] It is not necessary to decide whether the time of his "residence" is to be measured by that of his absence from the United States, or of his presence in Britain, for, even if we take the first measure, he lacked five days of two years. It does, however, make a difference whether one counts as part of his "residence" in London the vacation of three months which he was given at once upon his return; and he argues that, since the Regulations allow vacations as part of "residence," a terminal vacation is no different from an intervening one. We do not agree. In the language of § 29.116-1: "temporary absence therefrom in the United States on vacation" will not necessarily deprive one of the exemption; and a terminal vacation is not a "temporary absence," but a final absence, "therefrom": *i. e.* from the foreign country. Moreover, § 29.211-5—one of the sections

6. § 116 (a) (2), Title 26, U.S.C.A.

made applicable to citizens by § 29.116-1—confirms this reading, for it declares that one "who has acquired residence in the United States retains his status as a resident until he abandons the same and actually departs from the United States"; which, when applied to citizens, means the place of foreign "residence." When Seeley took ship from Britain in June, 1944, not only did he "actually depart from," but he meant to "abandon," that country, for apparently his job was at an end. It is true that there is nothing in the record to show whether his job was in fact at an end; but, like all taxpayers, he had the burden of proof and he did not prove it. There is nothing the contrary of this in Neuberger v. United States, supra,[7] or in White v. Hofferbert, supra;[8] for, although in both these decisions long enforced absences were counted as part of a "residence," they were interruptions of a continuous stay, to which the taxpayer meant to return; they were not held to extend a "residence" beyond the day when the "resident" leaves, *animo non revertendi*.

■ A final question might be raised. it might be argued that, if, as we are assuming *arguendo*, until June 20, 1942, Seeley retained his Swedish "residence," it was revived as soon as its temporary substitute, his British "residence," ended; and that his presence in the United States waiting resumption of his Swedish "residence," may be regarded as reviving his Swedish "residence" which had meanwhile been only suspended. That would probably not be true, even in the case of "domicil"; at least the Restatement of Conflict of Laws states that abandonment of a "domicil of choice" does not revive the domicil of origin.[9] Be that as it may, no such doctrine applies to "residence," because, although everyone must have a domicil,[10] the law does not require everyone to have a residence. It follows from the foregoing, that the order of the Tax Court for 1943 should be reversed, and the deficiency expunged; but that the order for 1944 should be affirmed. We understand that the parties will settle between themselves any deductions for medical expenses.

Order for 1943 reversed and assessment expunged.

Order for 1944 affirmed.

On Petition for Rehearing.

PER CURIAM.

The petitioner asks for a rehearing upon his exemption for 1944, based on the following argument. We did not pass upon whether he retained his "residence" in Sweden until he went to London; all we decided was that he established a residence in England while he was assigned in London; but we held that he had not shown two years residence there, dating from July 20, 1942, when he left the United States. If, however, on that day he was still a "resident" of Sweden he now argues that we should not have begun his foreign residence on July 20, 1942, because § 116(a) (2) does not require residence in a single "country" but in "a foreign country or countries". Hence, he concludes, we must decide whether his Swedish residence had ended before July 20, 1942.

■ Let us agree for argument that this is true, although the point was not raised before; nevertheless we hold that Seeley's Swedish residence had ended before he was assigned to duty in London. Section 29.116-1 provides that "temporary absence * * * in the United States on vacation on business trips will not necessarily deprive" a man of an "established" foreign residence and Judge Chesnut's holding in White v. Hofferbert, supra, D.C., 88 F.Supp. 457, was no more than that a man who had come back to the United States on a "business trip," and was held over because he could not go back, did not lose his residence. It is true that Seeley's "return trip * * * was made at the direction of the Management for the purpose of discussing the war situation and its impact upon the company's business in Sweden"; and that he expected

7. 2 Cir., 13 F.2d 541.

8. D.C., 88 F.Supp. 457.

9. § 23, Comment (b).

10. Restatement of Conflict of Laws, § 11, Comment (a).

to return and kept his apartment and servants for six months. So far, therefore, it is permissible to say that he was temporarily absent in this country on a "business trip." However, it should be remembered that the regulation only says that such an absence will not "necessarily" result in breaking an "established" residence; it does not say that it will never do so, and it implies that it may. It is one thing to say that a man who is caught here upon a business trip and cannot get back, retains his foreign residence; it is another to say that he does so, when for the period of a year he has been employed upon two other jobs and is about to be sent abroad on a third. We will assume that the period between his arrival in February, 1941, and June 1, 1941, is to be accounted a "vacation" and that it did not break his Swedish residence. However, from June 1 to September 1 he was at work at some undisclosed job in New York, and thereafter until June 20, 1942, he was assigned as "Staff Assistant of the Pacific Region" until he was sent to London. Certainly during that year he cannot be said to have been "on vacation"; and it seems to us that, although, as we have said, he may fairly be held to have left Sweden on a "business trip," he was not still on such a "trip" after he was assigned to his New York jobs.

Petition denied.