James E. BROWN, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 246–82C.

United States Claims Court.

March 7, 1984.

As Corrected March 13, 1984.

On Motion for Reconsideration
April 18, 1984.

See also 3 Cl.Ct. 409.

Janet Cooper, Washington, D.C., for plaintiff.

Randall B. Weill, Michael T. Paul, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

This is the final stage of a civilian pay case, in which plaintiff, James E. Brown, has sought reimbursement of travel, transportation, and relocation expenses, including vacation leave, as well as compensatory damages, back pay, and reinstatement. Plaintiff's petition was filed on May 17, 1982, and amended on December 2, 1982. It contained ten counts alleging that defendant, through a series of actions committed by the Department of the Army, arbitrarily and capriciously denied him various benefits to which he was entitled as a federal civilian employee.

In its opinion issued on July 14, 1983, this court ruled on the parties' cross-motions for summary judgment, dismissing nine of plaintiff's ten counts. *See Brown v. United States*, 3 Cl.Ct. 31 (1983). However, with respect to the remaining Count VI, the court held that genuine issues of material fact existed, including but not limited to plaintiff's place of actual residence in August 1971, relating to renewal agreement travel expenses and home leave sought between 1974 and 1980. Accordingly, a trial on the merits was held on Sep-

tember 23 and 26, 1983, on said genuine issues of material fact arising from Count VI. The court's findings of fact pertinent to Count VI, the foundation for many of which was not clearly elicited by the parties, are set forth below. Additionally, many of the operative facts were stipulated by the parties, and to that extent, the court finds accordingly. For the reasons stated hereinafter—most notably, that plaintiff's "place of actual residence" in August 1971 was not in the United States—the court is of the view that plaintiff is not entitled to recover.

## FACTS

Plaintiff was born in 1941 in Cornersville, Tennessee (a small town contiguous to Lewisburg, Tennessee). He lived in Lewisburg, except for a short period after birth, until 1960, at which time he entered the military service. He served in the Army from 1960 to 1963, a portion of which time was spent in West Germany. In May 1963, shortly prior to the expiration of his military service, plaintiff married Elfe Linxen, a German citizen of Offenbach, West Germany, in the nearby town of Hanau. He has two children, a son and a daughter, from this marriage, who according to the stipulation of the parties were born in Offenbach in August 1964 and January 1967, respectively. Plaintiff's wife, who died prior to plaintiff's filing of this action, lived her entire life in Offenbach, and no affirmative evidence was offered that she ever visited the United States after her marriage to plaintiff. Initially in 1976, and again in 1978, plaintiff's children visited this country for short periods while plaintiff was vacationing. Elfe Brown owned a house in Offenbach, located on land owned by the city, where she and the two children lived during the entire period pertinent to this lawsuit.

In mid-1963, plaintiff returned to the United States from Germany for separation from the military service. Upon arrival, he was hospitalized in St. Albans Naval Hospital in New York where he required surgery for an undisclosed ailment. Thereafter, he

received a medical disability discharge from the Army on August 19, 1963, as a qualified 10-point preference veteran. From the time of his discharge until May 1964, plaintiff recovered from surgical complications at his family's home in Lewisburg. He testified that his spouse was to "join me in the United States"; however, because she had "problems" disposing of the property "she owned," she could not join him in the States; and that after attempting to resolve the problem from Lewisburg, he returned to Germany in May 1964 "to try to assist in the disposing or reaching [sic] some kind of equitable solution to the problem..." The record also shows that plaintiff was unemployed while recuperating in Lewisburg.

Upon his return to West Germany, plaintiff obtained employment as an accounting clerk therein by the Armed Forces Exchange Service beginning in June 1964. Plaintiff held this job until June of 1965, when he accepted the first of what was to be a series of temporary overseas limited appointments with the Department of the Army in Frankfurt until February 1967, culminating in the position of a GS–4 procurement clerk. On February 17, 1967, he resigned from the latter position with the Army, citing personal reasons and dissatisfaction with the policy limiting overseas service to five years.

Towards the end of the foregoing period of employment in Frankfurt, plaintiff was asked by a "contracting officer's representative" whether he was willing to work for a government contractor, the Raytheon Company. He answered in the affirmative, and submitted an application to the company's home office in Andover, Massachusetts.

Plaintiff testified that he was hired by Raytheon "for Andover, Massachusetts," as a Logistics Specialist and was contracted

to the U.S. Army Missile Command at Red Stone Arsenal, Alabama, with a duty station in West Germany for an indefinite period. He further emphasized that it was the U.S. Army Missile Command that assigned him to West Germany on orders in February 1967, and not Raytheon, who had no "contact" there. The record shows, however, by a letter from Raytheon's Program Administrator that plaintiff was placed on its active payroll on January 16, 1967, and was hired locally in Germany. Plaintiff testified that he reported to Roedelheim, West Germany in February 1967, following a short two-week leave (late January and early February) in the States.[1] He continued to be sustained in Roedelheim on Raytheon's payroll in the foregoing status from January 16, 1967 to July 19, 1970.[2]

On July 19, 1970, plaintiff was transferred to the corporate headquarters of Raytheon in Massachusetts to await orders for assignment to Seoul, Korea. The impending transfer came to the attention of plaintiff approximately 60 days before his return to the United States. He testified that during this period his wife had negotiated to sell her house in Offenbach, and "my family was supposed to join me [in the United States]." For reasons unspecified on the record, however, he and his wife changed their minds about selling the house shortly thereafter. A suit was filed against his spouse by the parties interested in acquiring the property prior to his departure (July 1970) and, while Brown was in Andover, these prospective purchasers had secured an injunction in the German courts prohibiting his wife from leaving the country "with or without selling the property."

When asked on direct where he lived between 1964 and 1967, while employed

1. There was an apparent overlap, from January 16 until February 17, 1967, when plaintiff was employed by both the Army and Raytheon. Plaintiff explained that this situation arose because he was exhausting his leave, accumulated with the Army, during the month in question.

2. Plaintiff's description of his position at Roedelheim on an SF–171 form filled out in 1971

stated that a component of his work at Roedelheim involved acting as liaison with representatives of foreign manufacturers and negotiating rental contracts with foreign property owners and realtors. Presumably, plaintiff's facility in the German language (he stated in the same SF–171 that his understanding of German was "excellent") was often utilized in this position.

intermittently by the Army, he stated in "my property" in Offenbach. Later, when asked where he lived while employed in Roedelheim by Raytheon during the period 1967–1970, plaintiff testified that he "moved around quite a bit," spending a portion of the time at 102 Friedenstrasse in Offenbach (*i.e.*, his wife's house), but also going to the Army facility at Friedberg, as well as Roedelheim and Frankfurt, West Germany.[3] However, on cross-examination, plaintiff admitted that he lived at 102 Friedenstrasse in Offenbach "between approximately January, 1964 and February, 1969," and did not specify where he lived during the remaining one and one-half years that he was stationed in Roedelheim.

Following his arrival in Andover, in July or August 1970, plaintiff went to Lewisburg for approximately seven days. Then, on August 17, 1970, pursuant to his request, plaintiff received a personal leave of absence from Raytheon to go to West Germany to attempt to resolve the lawsuit against his spouse. While in Germany, he was successful in causing the injunction to be lifted in early September 1970.

During the foregoing stay in West Germany, plaintiff received orders to report to Seoul, Korea, on September 14, 1970, at which time he departed Frankfurt for Seoul. Plaintiff's travel orders scheduled him for an indefinite period but not to exceed one year of temporary duty (TDY) in Korea, and then return to the point of origin. Shortly after his arrival in Korea, however, he learned that the injunction previously lifted in Germany was reinstated, preventing his family from joining him in Korea as scheduled. Again, because he felt that he, rather than his spouse, could best handle the suit and because of the difficulty he experienced in obtaining and/or paying for competent counsel, he

returned to Germany on October 27, 1970, and resigned from his post at Raytheon.[4]

While assisting his spouse at this time in the litigation, plaintiff testified that he did not initially seek employment in West Germany. In fact, plaintiff was continuously unemployed for the next six months (October—April), and devoted most of his attention to said lawsuit and related matters. He remained in Germany for approximately the first sixty days, then went to Lewisburg until an unspecified time in January 1971, when he returned to West Germany for approximately three weeks. In February 1971, he returned to Lewisburg until he again returned to Germany on or about March 28, 1971. While in Lewisburg, plaintiff filed a petition in bankruptcy, which circumstance was said to have been necessitated by heavy litigation expenses incurred in West Germany.

Plaintiff's return to West Germany on or about March 28, 1971 was, purportedly, solely for the purpose of assisting his spouse in pursuing the lawsuit. However, in view of his economic problems, he applied for employment at that time with the Army for the alleged purpose of "sustain[ing] myself and my family" for the duration of the lawsuit. When the issue of the duration of his intended stay in West Germany surfaced, plaintiff testified on cross-examination that "I had determined to stay there until I resolved that matter completely, whether it took one month, two months or three months ...." When government counsel asked whether he also intended to stay in West Germany for "a year," plaintiff responded by stating, "I did not expect it to last that long. But I had intended to stay there *until the matter was resolved.*" (Emphasis added.)

3. Roedelheim and Offenbach are both suburbs of Frankfurt, located in the immediate vicinity of that city. Friedberg is located approximately 15 miles north of Frankfurt.

4. A letter from Raytheon to the Army in 1971 states that he resigned from the company on October 27, 1970, but plaintiff testified that he requested a "leave of absence" on that date and

resigned at a later unspecified time when he discovered that the case would take a longer time to resolve than he had anticipated. He further testified that at this posture he had the decision reversed again and there was an appeal therefrom which made it imprudent for him to return to Seoul, Korea, necessitating his resignation.

On May 7, 1971, plaintiff was successful in obtaining an overseas limited appointment with the U.S. Army Engineer Command, Europe, in Frankfurt as a GS–5 accounting technician, at which time he resided in his wife's house in Offenbach. Because plaintiff's appointment was "intermittent" (*i.e.*, less than 40 hours per week), he was informed that his position did not entitle him to transportation to the United States, home leave, and various other benefits. Nevertheless, plaintiff testified that in May 1971, he was asked to submit, and indeed submitted, documentation pertaining to his place of actual residence, including evidence of voter registration, driver's license, bank account, and a passport.

In July of 1971, plaintiff was notified that he would be promoted to the position of Administrative Assistant, GS–7, at the Army facility in Worms, West Germany,[5] to be effective August 8, 1971. Plaintiff was given a "term" appointment, not to exceed September 13, 1975, to this new position. Upon notification of his promotion in July, plaintiff affirmed to the interrogating officer that the information he had supplied in May 1971, regarding his "place of actual residence", was correct. Plaintiff also completed, on arrival in Worms, DD Form 2496–1, a Logistic Support Entitlement Information questionnaire (Defendant's Exhibit 33). On this questionnaire, plaintiff indicated, *inter alia*, that he was recruited from Burlington, Massachusetts, for his assignment overseas on September 10, 1970; that he departed the United States for his overseas assignment on September 14, 1971;[6] and that he had not been without return transportation since his initial departure for overseas.

Prior to reporting to Worms, plaintiff executed a 36-month transportation agreement, DD Form 1617, with the appointing official in Frankfurt, on August 5, 1971 (Plaintiff's Exhibit 1). This form was apparently approved by the Army civilian personnel office in Frankfurt, after plaintiff listed therein his "place of actual residence" as Lewisburg, Tennessee. Plaintiff avers that while he was not eligible for a transportation agreement in May 1971 because he was then an intermittent employee, the evidence submitted at that time was the foundation for the inclusion of Lewisburg, Tennessee, in said transportation agreement. Following plaintiff's arrival in Worms, however, the responsible personnel officer at the Worms Area Civilian Personnel Office (WACPO) determined not to pay plaintiff his relocation and travel expenses previously authorized because he had been recruited for the GS–7 position in Frankfurt, not in the States, and could not prove his entitlement to return transportation to the United States from his former employer.[7] Plaintiff was then required, in order to obtain his relocation expenditures from Frankfurt to Worms, to sign a second DD Form 1617 (Plaintiff's Exhibit 2), dated August 9, 1971, which was identical to Plaintiff's Exhibit 1, except that it required plaintiff to remain overseas for a minimum period of "12 months" rather than "36 months."[8] Plaintiff's place of actual residence was typed in Exhibit 2 as Lewisburg, Tennessee, by the custodian of his personnel folder.

Plaintiff continued to work in Germany for the Department of the Army until 1981, when he was involuntarily transferred to Alexandria, Virginia. *See Brown*, 3 Cl.Ct. at 35–38. In July 1973, after he had been

---

**5.** Worms is located approximately 40 miles from Frankfurt.

**6.** September 14, *1970*, is the date that plaintiff left *Frankfurt* for Korea.

**7.** This decision was affirmed by three successive Army offices, culminating in a decision by the U.S. Army Civilian Appellate Review Office (USACARO) on November 2, 1972, that plaintiff's place of actual residence was Offenbach, West Germany, and that his transportation agreement should be corrected to so state. (There is no evidence that this was ever done.) The Comptroller General sustained the USACA-RO decision on January 27, 1975, and denied plaintiff's request for reconsideration of its initial decision on April 21, 1976 (B–182226).

**8.** This 12-month agreement only pertained to plaintiff's entitlement to relocation expenses from Frankfurt to Worms, and did not affect the term of his appointment with the Army.

terminated and then reinstated twice (allegedly because of his refusal to discontinue his protest against WACPO's 1971 determination), plaintiff was transferred from Worms to Frankfurt. Pursuant to this transfer, he executed another twelve-month transportation agreement in Worms, which again listed his "place of actual residence" as Lewisburg, Tennessee.[9] Plaintiff testified that he lived in various hotels and boarding houses in Worms in 1972–73. After his transfer to Frankfurt, he lived on Streubergstrasse in Roedelheim until October 1973, and continuously thereafter, until his return to the United States in 1981, in government quarters.

In July 1974, when plaintiff was nearing the completion of three years of service, he made one more appeal to the Army, this time for home leave travel allowances and other related benefits. This request was denied on August 5, 1974, because it was based on the same grounds upon which his request for a 36-month transportation agreement was premised and previously denied by USACARO on November 2, 1972. The 1974 denial was prefaced with the caveat that "[t]he decision rendered on 2 November 1972 is final and is therefore not subject to further review within the Department of the Army."

In view of said denial, plaintiff did not travel from West Germany to the United States for home leave in 1974, after three years of service had expired. He did travel to the United States, primarily to Lewisburg, in October 1976 (for approximately two weeks), in November 1978 (for approximately four weeks), and in early November 1980 (for approximately three weeks), at his own expense. Plaintiff's wife, from whom he was separated in 1973, did not accompany him on any of these trips.

Plaintiff testified that he had registered to vote at some time (unspecified) between 1963 and 1980 in Marshall County, Tennes-see, and that he has never registered to vote anywhere else. He testified further that he filed his federal income tax returns every year since 1963 with the regional IRS office that covers Tennessee. He never filed a state tax return (to the best of his knowledge, Tennessee has no individual income tax), and he has never paid taxes in Germany. Plaintiff stated that he has never owned any "property" in Germany, and that his personal property remained in Lewisburg after 1963 "except that which [he] accumulated after leaving Lewisburg," which "was always with [him]." Finally, he testified that he "owns" a portion of his family's real property in Lewisburg, which is deeded to his father and on which is located the latter's home. This claim is based upon an apparently oral agreement with his father, made on an unspecified date, none of the provisions of which were revealed on the record. Plaintiff did testify, however, that he helps his father to pay real property taxes (unspecified as to frequency and amount) and that he has helped to physically maintain the property on his visits to Lewisburg.

## DISCUSSION

Plaintiff herein claims entitlement to renewal agreement travel expenses, under 5 U.S.C. § 5728, for the trips he took to the United States in 1976, 1978, and 1980, as well as all home leave accumulated and not used between 1971 and 1981, under 5 U.S.C. § 6305. Defendant contends, conversely, that:

(1) plaintiff's claims under Count VI are barred by the applicable statute of limitations;

(2) plaintiff is not entitled to the benefits he claims, *supra*, because his "place of actual residence" was not in the United States at the time of his appointment in August 1971, and at no time did he have

---

9. Plaintiff signed a fourth transportation agreement in August 1983, in connection with a transfer from the United States and a new term appointment in Germany, which also listed his place of actual residence as Lewisburg, Tennessee. This agreement was for a 36-month period.

It was approved by an official who testified that she had no knowledge at the time of its execution of the on-going dispute regarding plaintiff's residence or of plaintiff's personal and employment history in Germany.

the statutorily required written renewal agreement with the government; and

(3) in any event, this court has no jurisdiction to declare that plaintiff is entitled to relief under 5 U.S.C. §§ 5728 and 6305.

The court is of the opinion, *infra,* that defendant's threshold contention is misplaced. With respect to defendant's second contention, the court is constrained to agree because plaintiff's proof, that his "place of actual residence" was in the United States, is substantially wanting. Since this conclusion is dispositive of the merits, it obviates the need to pass on defendant's remaining contentions.

## I. *Statute of Limitations*

Plaintiff alleges that four causes of action arose in his favor between 1974 and 1980 under 5 U.S.C. §§ 5728 and 6305; *i.e.,* in August 1974 after three consecutive years of employment under his term appointment in West Germany, and every 24 months thereafter, in August 1976, August 1978, and August 1980.

■ The initial challenge raised by defendant is that the pertinent statute of limitations (28 U.S.C. § 2501) is a total impediment to plaintiff's raising such claims in this court. In short, the basic provision of said statute bars all claims brought in this court more than six years after the claim "first accrues." [10]

■ With respect to the period after 1971, the parties have stipulated that plaintiff travelled from West Germany to the United States in May 1973 for the purpose of attending his mother's funeral, and three times thereafter, in October 1976, November 1978, and November 1980, for vacation. The parties differ, however, as to when plaintiff's claim(s) first accrued. Plaintiff's argument that he has four separate claims is based upon a line of cases from our predecessor court, the Court of Claims, which have held that "[a] claim against the United States first accrues on the date when *all* the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Oceanic Steamship Co. v. United States,* 165 Ct.Cl. 217, 225 (1964); *see also Terteling v. United States,* 167 Ct.Cl. 331, 338, 334 F.2d 250 (1964). Under plaintiff's theory, "all the events" which fixed the liability of the United States and entitled him to institute an action did not occur until August of 1974, 1976, 1978, and 1980, respectively, because it was only at these times that he completed the requisite periods of service to entitle him to home leave travel. Plaintiff therefore contends that his claims for home leave benefits due him in August 1976, 1978 and 1980 are not barred by the statute of limitations because each entitlement accrued within six years of the May 17, 1982 filing date. [11]

Defendant, in turn, relies on a line of Court of Claims cases holding that "a claim first accrues when the government official or agency responsible for determining the plaintiff's rights takes final action that is dispositive of the claim." *See, e.g., Brownfield v. United States,* 218 Ct.Cl. 477, 482, 589 F.2d 1035 (1978). Under defendant's theory, plaintiff's claim first accrued either on August 9, 1971, when the WACPO office first denied him a 36-month transportation agreement, or on August 5, 1974, when plaintiff's grievance for renewal agreement travel expenses was denied, at

10. Another provision of the statute, styled the "beyond the seas" exception, permits claims of a person under a legal disability or beyond the seas at the time the claim accrues to be filed within three years after the disability ceases. There is no need to implicate this exception in the instant case for all claims accruing after May 1976, because such claims would have been filed within the general six-year statutory period under § 2501. Moreover, all claims accruing prior to May 1976, including plaintiff's first cause of action, which allegedly accrued in August 1974, are barred by the "beyond-the-seas"

exception (in addition to the six-year general statute of limitations) because plaintiff's "disability" ceased with his trip to the United States in October 1976, more than three years prior to the filing of his claim in May 1982.

11. Although plaintiff conceded that he is ineligible for home leave travel in 1974 because he took no trip to the United States that year, he still inexplicably stated that one of his four causes of action in Count VI accrued against the government in August 1974.

which time he was advised that "[t]he decision rendered on 2 November 1972 (*i.e.,* the USACARO decision) is final and is therefore not subject to further review within the Army." If the court were to embrace defendant's theory, such would require a holding that all of plaintiff's claims are barred, because these claims would have accrued more than six years prior to the filing date of the petition.

The court agrees with plaintiff's theory, and believes, for the reasons stated, *infra,* that the authority relied on by defendant is inapposite to the issue here. The *Brownfield* line of cases, relied on by defendant, involved factual situations (*e.g.,* disability pay) in which the administrative body in question took final dispositive action *after* all of the events that fixed the liability of the government had occurred. *See, e.g., Brownfield,* 218 Ct.Cl. 477, 589 F.2d 1035; *Dye v. United States,* 166 Ct.Cl. 540, 543 (1964). In contrast, the decisions by the Army in both 1971 and 1974 were made *before* plaintiff had served the necessary period which could entitle him to home leave and travel benefits in 1976, 1978, and 1980, if all of the statutory elements of 5 U.S.C. §§ 5728 and 6305 were met. It is clear beyond cavil that if plaintiff had sued the Army in 1971 or 1974 for travel and home leave that he would not take until 1976, 1978, and 1980, he would not have stated a claim upon which relief could be granted by this court. *See Kirby v. United States,* 201 Ct.Cl. 527, 533–36 (1973); *Palmer v. United States,* 129 Ct.Cl. 322, 326–27, 121 F.Supp. 643 (1954).

Moreover, contrary to defendant's assertions, the instant case appears to fall clearly within the "continuing claim" category defined in *Friedman v. United States,* 159 Ct.Cl. 1, 6–8, 310 F.2d 381 (1962). Such claims for periodic payments as plaintiff's are deemed to be within the "continuing claim" category if they are premised on rights conferred by statute, independent of any action of an administrative board or agency, where the court must pass *de novo* on all issues of law and fact. *Id.* at 7, 310 F.2d 381; *Levadi v. United States,* 137 Ct.Cl. 97, 100 (1956). In such "continuing

claim" cases, each successive failure to make proper payment gives rise to the accrual of a new claim or cause of action upon which a suit can be brought. *Beebe v. United States,* 226 Ct.Cl. 308, 324, 640 F.2d 1283 (1981); *Friedman,* 159 Ct.Cl. at 8, 310 F.2d 381. The "continuing claim" cases are markedly distinguishable from those such as in *Brownfield, supra,* in which the cause of action does not accrue until after a determination, entrusted by Congress to an administrative official, is made. *See Friedman,* 159 Ct.Cl. at 9, 310 F.2d 381, and cases cited therein. Because the rights conferred by §§ 5728 and 6305 stem exclusively from the statute, independent of any administrative action, and because this court must consequently pass *de novo* on all issues of law and fact, we hold that all of plaintiff's claims for renewal agreement transportation expenses (in 1976, 1978, and 1980), as well as that portion of his home leave that was purportedly earned within six years of the May 17, 1982 filing date, are not barred by 28 U.S.C. § 2501.

## II. *Place of Actual Residence—Regulations*

◼ Next, defendant contends that plaintiff is not entitled to travel and transportation expenses for vacation leave because his "place of actual residence" was not in the United States at the time of his appointment or transfer in August 1971. Plaintiff's claim for such transportation expenses is premised upon 5 U.S.C. § 5728(a) (1979), which provided, during the period when his claims accrued, as follows:

(a) Under such regulations as the President may prescribe, an agency shall pay from its appropriations the expenses of round-trip travel of an employee, and the transportation of his immediate family, but not household goods, from his post of duty outside the continental United States to the *place of his actual residence at the time of appointment or transfer* to the post of duty, after he has satisfactorily completed an agreed period of service outside the continental United States and is returning to his actual

place of residence to take leave before serving another tour of duty at the same or another post of duty outside the continental United States under a new written agreement made before departing from the post of duty. (Emphasis added.) [12]

The Department of Defense Joint Travel Regulations (JTR), in effect at the time of plaintiff's appointment in August 1971, provide the standards by which plaintiff's eligibility for transportation expenses was to be determined. These regulations state that the government must negotiate a transportation agreement with all new appointees recruited for overseas service at a geographical locality other than that in which their place of actual residence is located. JTR ¶ C4002(1)–(2) (1971). Such transportation agreements operate as an understanding between the government and the employee, wherein the government agrees to furnish transportation (and other related benefits) to the employee's "place of actual residence" in the United States, in consideration for which the employee agrees to remain in service at the overseas duty station for a specified period. *Id.,* ¶ C4001. Employees who satisfy the conditions of the initial transportation agreement become eligible for a renewal agreement, which entitles them to return transportation to their place of actual residence in the United States for vacation leave, provided that they serve an additional specified period at their overseas posts. *See id.,* ¶ C4151. The period of service required in transportation agreements for employees stationed in West Germany is three years under the original travel agreement and two years for each renewal agreement. *Id.,* ¶ C4005.

The employee's "place of actual residence" for the renewal agreement must be the same as that designated on the original agreement, unless there was an error in the original agreement. *Id.* ¶ C4004(d). The "place of actual residence" in the original agreement, in turn, must be determined at the time of appointment or transfer. *Id.,* ¶ C4002(a). Thus, plaintiff is entitled to renewal agreement travel for the years 1976, 1978, and 1980 only if his "place of actual residence" as of August 8, 1971 (the date of his first "term" appointment overseas) was in the United States.

Prior to the time of plaintiff's initial overseas term appointment, *supra*, he was intermittently employed in West Germany by the Army. Since plaintiff was an overseas local hire with respect to said term appointment, his entitlement to negotiate an initial transportation agreement was governed by JTR ¶ C4002–3, which provided, in pertinent part, as follows:

a. *General.* Overseas local commanders in foreign areas will negotiate an initial agreement with a locally hired employee if the conditions in subpar. b are met.

\* \* \* \* \* \*

b. *Conditions*

(1) *Bona Fide Residence in the United States.* To be eligible to negotiate an agreement, the employee must be able, at the time of appointment or assignment, to establish to the satisfaction of the appointing official, *bona fide place of actual residence* (see par. C4004) *in the United States....*

(2) *Qualifying Presence in the Area.* For the purpose of establishing qualifying presence in the area, an employee shall be considered to have residence in the United States if his status in the area *prior to employment* was that of:

\* \* \* \* \* \*

2. a traveler for business or vacation purposes, who has been absent from the United States for not more than 6 months;

\* \* \* \* \* \*

4. an employee of another Federal department, agency, or instrumentality, Government contractor, ... and any other activity or agency which the overseas command determines to be operating in support of the United States or its personnel in the area,

---

**12.** A 1982 amendment made a change in the statute that is immaterial to the instant case.

*providing the individual was recruited in the United States under conditions of employment which provided for return transportation;* (Emphasis added.)

The pertinent portion of ¶ C4004 relating to the determination of "place of actual residence," which is incorporated into ¶ C4002-3(b), *supra,* reads as follows:

b. *Factors for Consideration.* The place of actual residence is *the fixed or permanent residence, normally, where dependents and household goods are maintained at the time of an employee's appointment to an overseas position.* Generally, the place of actual residence is the place from which transferred or appointed. This, however, is not always so. *The desire of an* applicant or *employee to specify a location as place of actual residence that is not justified as reasonable, or merely because of an intention to establish residence or visit some place, will not be a basis for designating such place as that of actual residence for transportation eligibility purposes. All available facts* concerning the employee's residence *prior* to assignment to overseas duty will be carefully considered such as home ownership, previous residence, temporary employment in city from which recruited, employment requiring residence apart from the family, the employee's voting residence, the place where the employee pays taxes. Additional facts for consideration, in the case of a local hire, are the length of absence from the claimed place of residence and the reasons for such absence; whether a residence has in fact been maintained to which the person expects to return; whether the person has in fact actually established residence locally overseas, participated in local elections, or obtained waiver of United States tax liability based on foreign residence which would negate a claim of place of actual residence in the United States (35 Comp.Gen. 244; 37 Comp.Gen. 846). Additionally, the conditions in par. C4002-3 will be used in determining

place of actual residence in the United States. (Emphasis added.)

It is unclear from the face of ¶ C4002-3(b), *supra,* whether only *one* or *both* of the conditions in subparagraphs (1) and (2) must be satisfied before an employee, who is an overseas local hire, is eligible for an initial travel agreement; *i.e.,* whether conditions (1) and (2) are intended to be in the conjunctive or the disjunctive. However, there is no need to decide whether these conditions are read in the conjunctive or disjunctive because the court believes that plaintiff's proof is fatally deficient under both subparagraphs (1) and (2).

Looking, then, at the "bona fide residence" criteria of ¶ C4002-3(b)(1) and ¶ C4004, a number of the listed criteria point to West Germany, and particularly Offenbach, West Germany, as plaintiff's "place of actual residence" at the time of his appointment while others point to Lewisburg, Tennessee. Indisputably, the fixed or permanent residence where plaintiff's dependents and household goods (at least those accumulated since plaintiff left Lewisburg in 1964) were located was in Offenbach, and plaintiff was residing in Offenbach at the time that he was both "appointed" and "transferred," in May and August of 1971, respectively. Moreover, looking back from August 1971, for approximately six years and nine months of the previous seven-year and three-month period, plaintiff had been residing in or within approximately 20 miles of Offenbach. (Approximately three months of the remaining six months were spent in Lewisburg on four visits, two of which were concededly for "vacations.")

On the other hand, positive indicia on the issue indicate that plaintiff's voting residence was clearly in Tennessee, plaintiff paid taxes to the IRS regional office that covers Tennessee, and he never formally established residence, voted, or obtained a waiver of his U.S. tax liability while in West Germany. Additionally, plaintiff testified that a residence was maintained in Lewisburg to which he expects to return; however, no specific time was indicated.

He also conceded that this residence was owned and occupied by his parents throughout the period pertinent to this lawsuit.[13]

Because § 5728, the statute's legislative history,[14] and the related JTR do not provide a structured definition of "place of actual residence," and because application of the factors in ¶ C4004 does not, on the proof adduced, reveal a clear-cut place of plaintiff's "actual residence" in August 1971, the court has looked to other sources for indications of the factors in the regulations which deserve the greatest weight in plaintiff's case. In addition to the literal language of § 5728 and interpretations of this language by other courts, these sources also include the interpretations of § 5728 and its predecessor by the General Accounting Office (GAO).

First, Congress presumably meant to require something other than mere "residence" when it utilized the term "place of *actual* residence." This is particularly understandable when it is considered that a vast uncertainty surrounds the meaning of "residence," a term which "has an evasive way about it, with as many colors as Joseph's coat." *Weible v. United States,* 244 F.2d 158, 163 (9th Cir.1957).

In interpreting the term "residence" as used in statutes, the courts have tended to divide the pertinent statutes into two groups. "Residence" in the first group of statutes was thought of as "legal residence," a concept considered somewhat akin to domicile, in which actual residence in a location plus the intent to make this location one's permanent home, were required. "Residence" has generally been considered similar to "domicile" in statutes governing voting, wills, guardianship, and other areas in which it was thought desirable for individuals to have only one legal home, where the place of intent to make a permanent home was often controlling.

*See, e.g., Osborn v. O'Barr,* 401 So.2d 773, 775 (Ala.1981) (voting); *Kortvellessy v. Korty,* 102 N.J.Super. 226, 245 A.2d 757, 760 (1968) (probate matters); *In re Fox Guardianship,* 212 Or. 80, 318 P.2d 933, 937–38 (1957) (guardianship).

In contrast, "residence" in other statutes has been thought to mean "actual residence," which term has been considered to include a more or less temporary residing place, requiring physical presence (beyond a brief sojourn) and little more. *See Penfield v. Chesapeake, Ohio and Southwestern Railroad Co.,* 134 U.S. 351, 357, 10 S.Ct. 566, 568, 33 L.Ed. 940 (1889). The word "residence" has been construed as meaning "actual residence" or a close facsimile thereof in statutes governing taxation, welfare eligibility, service of process, attachments, and other areas where an individual's physical location for an extended period, rather than his intent, is considered the dispositive factor. *See, e.g., id.* (attachments); *Weible,* 244 F.2d at 163 (income taxation); *In re Wilson,* 79 N.D. 539, 58 N.W.2d 470, 471–72 (1953) (welfare eligibility); *417 East Realty Associates v. Ryan,* 110 Misc.2d 607, 442 N.Y.S.2d 880, 884 (1981) (service of process); *see generally McGrath v. Kristensen,* 340 U.S. 162, 175, 71 S.Ct. 224, 232, 95 L.Ed. 173 (1950).

Congress's literal use of the words "place of *actual* residence" in § 5728 therefore appears to eliminate much of the ambiguity which might arise from simply using the word "residence." We believe that such circumstance should be considered to mean the place where one had actually (in fact, not fictionally) resided, in a status other than as a transient or sojourner. *See United States v. Anderson,* 238 F. 648, 649 (D.Mont.1917).

### A. *GAO Opinions*

Opinions of the GAO, the agency that drafted the forerunner of § 5728 [15] and

---

13. No substantive proof was adduced to establish a legal interest of plaintiff in any realty in either the United States or Germany.

14. *See, e.g.,* S.Rep. No. 1944, 83d Cong., 2d Sess. (1954); H.R.Rep. No. 2186, 79th Cong., 2d Sess.

6 (1946) (Committee reports on the predecessor statutes of § 5728).

15. *See* 92 Cong.Rec. 9189 (1946).

which has been looked to for guidance on the meaning of its terms ever since (see references to GAO opinions throughout the JTR), should also be considered to the extent they can shed light on the meaning of "place of actual residence." Although the opinions of the Comptroller General are not binding on this court, it is axiomatic that they deserve great deference on the meaning of § 5728, because of the unique role played by the GAO in authoring and interpreting the statute for nearly four decades. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Acker v. United States,* 223 Ct.Cl. 281, 290, 620 F.2d 802 (1980).

> In a 1971 case, the GAO stated that:
> The term ["actual residence"] as used in the statute generally would be understood to mean the *place* at which *he physically resides* at the time of his appointment. However, we have recognized that, in a proper case, the term may include the "legal residence" or "domicile" of the employee.

50 Comp.Gen. 644, 646 (1971) (Emphasis added.). Thus, the GAO has recognized that, in general, the term "actual residence" should be distinguished from "domicile" or "legal residence," except in a "proper case." [16] The GAO has adhered to a strict construction of the statute, and has refused to permit federal agencies to provide transportation expenses not specifically authorized by Congress. B–124005, Oct. 6, 1955. In making determinations on a case-by-case basis, the greatest amount of weight has been given by the GAO to the place where employees have shown the intent to reside indefinitely prior to appointment, especially if it is also their place of family life (*i.e.,* dependents) prior to appointment. *See* 45 Comp.Gen. 444, 447 (1966); 45 Comp.Gen. 136 (1965). Lesser weight has apparently been given to factors such as voting residence and place of

paying taxes. *See* 45 Comp.Gen. 136 (1965); 35 Comp.Gen. 244, 246 (1955).

### B. *Application of ¶ C4002–3(b)(1)*

The foregoing discussion leaves little room for doubt that plaintiff's "place of actual residence" should be the place where he most recently had actually resided for an indefinite period prior to his term appointment on August 8, 1971. While plaintiff has presented some credible indicia that might tend to show an intent to reside permanently in Lewisburg at some indeterminate future time, the greater weight of the probative evidence requires the conclusion that Offenbach, Germany, was his "place of actual residence" as of said date. Plaintiff, like all other locally hired employees, bears the burden of affirmatively proving that his bona fide place of actual residence was in the United States at the time of appointment. *See* JTR ¶ C4002–3(b)(1) (1971); *Trifunovich v. United States,* 196 Ct.Cl. 301, 312 (1971). Not only has plaintiff failed to so prove, he also has not sufficiently rebutted the strong presumption of actual residence in West Germany created by the considerable length of time, including the four months immediately prior to his term appointment, in which he resided in or near 102 Friedenstrasse in Offenbach, the apparent permanent residence and domicile of his wife and children.

The factors under ¶ C4004 that point to plaintiff's residence in Lewisburg do not appear nearly as probative as those that point to Offenbach. First, the fact that plaintiff was registered to vote in Tennessee, rather than in Germany, conveys little significance with respect to his place of actual residence. Plaintiff presumably would have found it impossible to vote in Germany unless he acquired German citizenship. Plaintiff's failure to show that he had ever in fact voted in Tennessee, and if

---

**16.** The only "proper case" specifically enunciated by the GAO involved employees who had resided in the Panama Canal Zone since birth or at a young age, after their parents' transfer there. 26 Comp.Gen. 488, 490–92 (1947). In such a case, the children, who were no longer eligible for transportation as dependents of their parents, were constructively considered, as "extensions" of their parents, to have come to their posts of duty from their parents' place of actual residence.

so the regularity with respect thereto, also tends to diminish the relative significance of his voting residence in a determination of his "place of actual residence."

Secondly, the fact that plaintiff consistently paid his United States federal income taxes and did not seek a waiver of his United States taxes on the ground of his residence in Germany also has a diminished significance on the instant issue. This is particularly true, in that plaintiff testified that taxes in West Germany were "substantially higher" than in the United States; thus, paying federal income taxes in the United States rather than in Germany was apparently in his financial interest. Thirdly, plaintiff's testimony that he was not legally considered a "resident" of West Germany by the West German government says little, if anything, on the dispositive issue here; the record is silent as to the standards the German government utilized in making such a determination. Moreover, the absence of a *legal* residence in Germany does not *ipso facto* establish plaintiff's "place of actual residence" in Tennessee. Finally, plaintiff's testimony relating to his "ownership" and maintenance of real property in Tennessee is also patently insufficient to demonstrate that he in fact "owned" property or maintained a residence there, particularly in light of his burden of proof to establish such operative facts.

■ Plaintiff has also contended throughout this proceeding that the Army's acceptance of DD Form 1617 on four occasions between 1971 and 1983 with "Lewisburg, Tennessee" listed as his "place of actual residence" constitutes a tacit admission by the government that his place of actual residence was indeed in Lewisburg. This position apparently represents a tactical retreat from plaintiff's position in earlier litigation, specifically rejected by the Court of Claims and the GAO, that the Army is estopped from changing a previous determination of place of actual residence. *See Brown*, 217 Ct.Cl. 710 at 712–13; B–182226, *supra*. Defendant responded to plaintiff's foregoing contention with testimony from its Army expert indicating that the listing of an employee's place of actual residence on a 12-month transportation agreement has no legal effect respecting vacation leave, because it entitles the concerned employee only to transportation from the place of transfer within West Germany, and that the initial 36-month transportation agreement was void in that it was superseded by the former.

The court is concerned as to the apparent indifference manifested by the Army in permitting the foregoing forms to remain uncorrected, particularly in light of USA-CARO's order in November 1972 that all of plaintiff's records should be changed to reflect Offenbach as his place of actual residence. Nevertheless, the Army's consistent position since 1971, in opposition to plaintiff's claimed entitlement, indicates that it at no time conceded such point. Because the issue of plaintiff's residence is to be decided *de novo*, this court must therefore determine whether plaintiff is legally entitled to the benefits he claims, not whether the conduct of the Army was arbitrary or capricious. *See Brown*, 217 Ct.Cl. at 713.[17]

### C. *"Bona Fide Residence" under the Internal Revenue Code*

■ Further support for the view that plaintiff's "bona fide place of actual residence," under JTR ¶ C4002–3(b)(1), was in fact in West Germany may be gleaned from the regulations and case law built around the term "bona fide residence" in

---

**17.** Plaintiff also testified at trial as to his belief that the NATO Status of Forces Agreement compelled the Army to list Lewisburg rather than Offenbach as his place of actual residence, because the United States was not permitted to hire residents of the host countries in view of said agreement. Plaintiff has neither presented evidence to support this assertion, nor did he pursue this contention in his pre-trial or post-trial briefs. Because the court's review of the NATO Status of Forces Agreement (4 U.S.T. 1792 (1953), TIAS No. 2846, June 19, 1951) indicates no such prohibition, and because plaintiff has apparently abandoned this point, the court concludes that it is without merit.

sections 871 and 911(a)(1) of the Internal Revenue Code (I.R.C.) of 1954, 26 U.S.C. §§ 871 (1982), 911(a)(1) (1976). While it is well settled that "residence" must be interpreted in the context of the statute in which it is found, *McGrath v. Kristensen,* 340 U.S. at 175, 71 S.Ct. at 232, we find a close parallel in both the language and the purpose of the terms in the I.R.C. and § 5728.[18] Because the regulations and case law under the foregoing sections of the I.R.C. are far better developed than their counterparts under § 5728, a brief discussion of the pertinent standards under the tax statutes as they relate to plaintiff would be informative here.

The regulations under § 871 defining a bona fide resident of the United States, as reworded in the *Weible* case, *supra,* to be directly applicable to one who is a bona fide resident of a foreign country, provide in pertinent part:

> A citizen of the United States actually present in a foreign country ... who is not a mere transient or sojourner is a *bona fide resident of [that] country....* Whether he is a transient is determined by his intentions with regard to the length and nature of his stay.... One who goes to a foreign country ... for a definite purpose which in its nature may be promptly accomplished is a transient; *but if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the citizen makes his home temporarily abroad he becomes a foreign resident,* though it may be his intention at all times to return to his domicile in the United States when the purpose for which he left the United States has been consummated or abandoned.

*See* Treas.Reg. 1.871–2 (1983); 1.911–1 (1979). (Emphasis added.)[19]

The case law under sections 911(a)(1) and 871 establishes clearly that plaintiff would be considered a bona fide resident of Germany under the Internal Revenue Code. Plaintiff's extended stay in West Germany, and his statement of intent to remain there for an indefinite period until the German lawsuit involving his wife's property was resolved, show beyond question that he was not a mere transient or sojourner there. *See Seeley v. C.I.R.,* 186 F.2d 541, 544 (2d Cir.1951); *Ditman v. Hofferbert,* 136 F.Supp. 542, 544 (D.Md.1954). The fact that he lived in or near the fixed residence of his German wife and children, that he understood German, and that his most recent employment required a substantial assimilation into the German community are additional indicia of residence in West Germany. *See, e.g., Scott,* 193 Ct.Cl. at 41–42, 432 F.2d 388, *Sochurek v. United States,* 300 F.2d 34, 38 (7th Cir.1962); *Schoneberger v. C.I.R.,* 74 T.C. 1016, 1026 (1980); *Stierhout v. C.I.R.,* 24 T.C. 483, 487 (1955).[20]

---

**18.** The two standards are not identical in all material respects. While the place of paying taxes is listed as a factor for consideration under ¶ C4004 of the JTR, it generally has not been considered important under § 911 whether an individual has paid taxes in the country of claimed foreign residence. *See Scott v. United States,* 193 Ct.Cl. 27, 37–38, 432 F.2d 1388 (1970); *White v. Hofferbert,* 88 F.Supp. 457, 461–62 (D.Md.1950). Section 911 also differs from ¶ C4004 in that § 911 requires physical presence (except for absence on business or vacation trips) for an entire taxable year, while ¶ C4004 has no such requirement. Nonetheless, the tax statutes and § 5728 look essentially to the same indicia of residence.

**19.** Section 911 of the I.R.C. was amended in 1978 to delete the blanket tax exemption for bona fide residents of foreign countries. *See* Pub.L. 95–615, 92 Stat. 3098–3100 (1978). Accordingly, the regulations pursuant to the bona fide foreign residence exclusion of section 911 were deleted. The definition of "bona fide resident" from the regulations under § 871, quoted in *Weible,* is still continued intact, however.

**20.** The above indicia demonstrate persuasively that plaintiff was a bona fide resident of West Germany beginning at least in the late 1960s. Pertinent case law also indicates that plaintiff would not have relinquished his bona fide residence abroad by his travel to the United States in 1970–71. In order to maintain bona fide residence abroad, two criteria must be satisfied. First, there must be reliable indicia that the individual will return abroad after his stay in the United States, and second, the stay in the United States must be brief, without substantial employment there. *See Carpenter v. United States,* 495 F.2d 175, 182 (5th Cir.1974); *Hen-*

### D. *"Qualifying Presence in the Area"*

■ Alternatively, plaintiff has contended that even if he was not a bona fide actual resident of Tennessee under JTR ¶ C4002–3(b)(1), he should nevertheless be considered an actual resident of Tennessee at the time of his 1971 appointment under the "Qualifying Presence in the Area" criteria of ¶ C4002–3(b)(2). He contends, first, that he qualifies under the second "Qualifying Presence" criterion (p. 9, *supra*), because in August 1971, he was a "traveler" in Germany for the "business" purpose of his wife's lawsuit, and had been absent from the United States for less than six months.

The court finds this contention to be specious and unsustainable. Although no definition is given of the words "traveler" or "business" in the JTR, the meaning of these words would be stretched beyond all logical bounds if plaintiff were considered a "traveler" for "business" in the only residence where he had ever lived with his wife and children, and in which he had spent most of the previous seven years. While plaintiff made two round trips between Germany and Lewisburg between November 1970 and April 1971, it appears from his testimony and the totality of the facts here that it was his presence in *Lewisburg* that could more properly be characterized as that of a "traveler" for "business," for the primary purpose of keeping himself financially solvent for the on-going German lawsuit.

■ Plaintiff has also contended that he qualified under the fourth "Qualifying Presence" criterion (*id.*), because he was an employee of a government contractor entitled to return transportation to the United States. This contention is equally without foundation. In order to qualify under this fourth criterion, plaintiff must have been an employee of the government contractor "prior to [the] employment" in issue, who had been *"recruited in the United States"* and had retained rights to return transpor-

tation to the United States. Even if it is assumed *arguendo* that plaintiff was an employee of a government contractor "prior to employment" with the Army (despite his six-month interlude of unemployment), plaintiff has presented absolutely no creditable evidence of his recruitment in the United States by Raytheon or of his entitlement to return transportation to this country as of either May or August 1971. Indeed, Raytheon's 1971 letters to a WACPO officer, stating that plaintiff "was hired locally in Germany" and had received the return transportation to which he was entitled, appear to indicate clearly that his assertions on these matters have no basis in fact.

### III. *Home Leave (5 U.S.C. § 6305)*

The statute and regulations governing home leave also clearly show that plaintiff is not entitled to such benefits. The pertinent statute, 5 U.S.C. § 6305, permits employees stationed overseas to be granted leaves of absence for use in the United States, over and above earned periods of annual leave. The regulations under § 6305 provide that only those employees who qualify under the standards of 5 U.S.C. § 6304(b) are eligible for home leave. 5 C.F.R. § 630.602 (1983).

Locally hired employees such as plaintiff qualify for home leave under § 6304(b)(2) if they qualify under either of two sets of criteria, reading in pertinent part as follows:

(A)(i) [those] who were originally recruited from the United States or its territories or possessions ...;

(ii) who have been in substantially continuous employment by ..., United States firms, ...; and

(iii) whose conditions of employment provide for their return transportation to the United States or its territories or possessions ...; or

ningsen v. United States, 243 F.2d 954, 957–58 (4th Cir.1957); Seeley, 186 F.2d at 546. In plaintiff's case, the foregoing two criteria were clearly satisfied during each of the three trips he took to the United States from 1970–71.

(B)(i) [those] who were at the time of employment temporarily absent, for the purpose of travel or formal study, from the United States, or from their respective places of residence in its territories or possessions ...; and

(ii) who, during the temporary absence, have maintained residence in the United States or its territories or possessions ... but outside the area of employment.

Plaintiff unquestionably would not qualify under the criteria detailed in (A). See p. 15, *supra; Brown*, 217 Ct.Cl. at 714 (plaintiff found not to have been "in substantially continuous employment" between November 1970 and May 1971). The holdings of the instant case that plaintiff was not a "traveler" while in Germany in 1971 and that both his place of actual residence and bona fide residence were not in the United States at this time are clear indications that plaintiff also cannot qualify for home leave under the criteria of subpart (B).

### CONCLUSION

The foregoing considerations, therefore, mandate one possible substantive holding in the instant case—that although plaintiff's 1976, 1978, and 1980 claims are not barred by the statute of limitations, plaintiff has not shown by creditable evidence that his place of actual residence at the time of his appointment was in the United States, nor has he shown his entitlement to home leave. Accordingly, plaintiff is not entitled to any relief under Count VI of his petition. Inasmuch as summary judgment was granted in defendant's favor on the other nine counts of plaintiff's petition in this court's opinion of July 14, 1983, the clerk is hereby instructed to enter judgment in favor of defendant and dismiss the complaint.

IT IS SO ORDERED.

### ON MOTION FOR RECONSIDERATION

█ In this civilian pay case, plaintiff seeks "reconsideration and/or rehearing" of this court's final judgment, entered on March 7, 1984. Plaintiff had initially filed his ten-count petition on May 17, 1982, alleging that the government, *inter alia,* had arbitrarily and capriciously denied him various benefits to which he was entitled as a federal civilian employee. In response to the parties' cross-motions for summary judgment, this court dismissed nine of the ten counts contained in plaintiff's petition in an opinion issued July 14, 1983. *See Brown v. United States,* 3 Cl.Ct. 31 (1983).

Following a trial on the merits on the remaining count (Count VI) of plaintiff's petition, this court dismissed said count in an opinion subsequently issued on March 7, 1984. Plaintiff then attempted to file subject motion for reconsideration on April 10, 1984, *i.e.,* thirty-four (34) days after the entry of judgment.[1]

Although plaintiff did not state explicitly which rule of this court he seeks to invoke by his present motion, he is apparently requesting relief under RUSCC 59(a)(1), which permits a new trial or rehearing "for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States." [2]

A motion under Rule 59(a)(1) is only efficacious, however, if it meets the requirements of RUSCC 59(b). As a threshold standard for relief thereunder, said rule provides, *inter alia,* that "a motion for a new trial or rehearing *shall be filed not later than 10 days after the entry of the judgment.*" (Emphasis added.) It is pat-

---

1. The court notes that plaintiff's subject motion was filed *pro se.* Further, it is noted that during the trial on the merits and post-trial briefing plaintiff was represented by counsel of record, noted *supra.* The records of the Clerk's Office, at this posture, contain no evidence that leave of court to file a motion to withdraw as counsel of record has been filed pursuant to RUSCC 81(d)(4).

2. Plaintiff's assertions contained in subject motion do not allege sufficient particularized factual allegations so as to constitute an appropriate claim under RUSCC 60.

ently clear from the language of this rule that a party seeking a rehearing or other relief *must* file a motion for such relief within the *immediate* ten days after entry of judgment. It is also equally clear that the imposition of discretion by this court in extending the filing date in motions for rehearing under RUSCC 59(a)(1) is conclusively foreclosed by RUSCC 6(b), which provides, in pertinent part, as follows:

When by these rules ... an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) order the period enlarged if request therefor is made by motion showing good cause before the expiration of the period originally prescribed ... or (2) upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect; *but it may not extend the time for taking any action under Rule ... 59(b),* ... except to the extent and under the conditions stated in them.... (Emphasis added.)

The courts that have interpreted Rules 6(b) and 59(b) of the Federal Rules of Civil Procedure (which rules essentially track RUSCC 6(b) and 59(b)) have consistently taken the position that the foregoing two rules do not permit courts to extend the time limits on such motions for reconsideration, because the ten-day period provided for in such motions is jurisdictional. *See, e.g., Gribble v. Harris,* 625 F.2d 1173, 1174 (5th Cir.1980); *Martin v. Wainwright,* 469 F.2d 1072, 1073 (5th Cir.1972); *Hulson v. Atchison, Topeka & Santa Fe Ry. Co.,* 289 F.2d 726, 729 (7th Cir.1961); *see also* Advisory Committee Report of Proposed Amendments to Rules of Civil Procedure, 5 F.R.D. 433, 486–87 (1946).

The Supreme Court has said of Rule 59 that it "in particular is based on an interest in speedy disposition and finality." *Browder v. Director, Department of Corrections of Illinois,* 434 U.S. 257, 271, 98 S.Ct. 556, 564, 54 L.Ed.2d 521 (1978). Accordingly, Rule 6(b) expressly precludes trial courts from using their discretion to permit tardy motions under Rule 59(b) because of its framers' view "that there should be a definite point [in time] where it can be said a judgment is final." *See* Advisory Committee Report, *supra,* 5 F.R.D. at 438 (Rule 6(b)).

The force of the foregoing considerations dictate, therefore, that this court must deny plaintiff's motion for reconsideration as untimely.

IT IS SO ORDERED.